## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| DUANE ZIEMBA | : | PRISONER CIVIL NO. 3:01CV2166 (JCH)(HBF) |
| v. | : | |
| JOHN ARMSTRONG, ET AL. | : | JULY 28, 2004 |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### I.    FACTS

By Amended Complaint dated August 7, 2002 ("the Complaint") the plaintiff, an inmate committed to the custody of the Department of Correction for the State of Connecticut ("DOC"), brings this action pursuant to 42 U.S.C. § 1983 against four DOC officials:   former DOC Commissioner Armstrong, former Warden Myers, Captain DeGray, and Medic McAllister. Plaintiff alleges violations of the Constitution relating to several alleged incidents occurring at Northern Correctional Institution ("Northern").   In particular, plaintiff alleges:   (1) that on March 4, 1999, after the plaintiff had slipped in the shower, defendants DeGray and McAllister denied the plaintiff medical care and defendant DeGray ordered guards to use force on the plaintiff by "dragging" him down a hallway, while kicking and punching him (Complaint, paras. 14-22); (2) that subsequent to the aforementioned incident, defendant DeGray and a team of guards had the plaintiff placed in four point restraints for punitive purposes (Complaint, para. 24); (3) that defendant DeGray confiscated and "stole" the plaintiff's legal materials (Complaint, paras. 25-27); and (4) that on March 9, 1999, defendant DeGray used excessive force on the plaintiff (Complaint, paras. 28-29).

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the defendants submit that they are entitled to summary judgment on a number of grounds. First and foremost, plaintiff's action against defendants Armstrong, Myers, and McAllister is legally deficient because the plaintiff cannot demonstrate the requisite personal involvement of these three defendants in the alleged constitutional violation(s). Additionally, based on the uncontroverted facts, the plaintiff cannot demonstrate a viable constitutional claim for excessive force against defendant DeGray or for deliberate indifference against defendants DeGray and McAllister. Finally, even if the Court indulges in the assumption that the plaintiff's constitutional rights were somehow violated during this incident(s), all of the defendants would remain entitled to summary judgment on the basis of Qualified Immunity.

## II.     STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) requires the entry of Summary Judgment "…if the pleadings, depositions, answers to interrogatories, and admissions on file together with any affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "[T]he mere existence of a factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A factual dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. A "material fact" is one whose resolution will affect the ultimate determination of the case. Id. In further comment regarding the use of summary judgment, the Supreme Court has stated:

summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules, as a whole, which are designed to secure the just, speedy and inexpensive determination of every action.

Celotex, Corp. v. Catrett, 477, U.S. 317, 327 (1986).

Used properly, Rule 56 is a "vital procedural tool to avoid wasteful trials," Capital Imaging Assocs. v. Mohawk Valley Medical Assoc., 996 F.2d 537, 541 (2d Cir.), cert. denied, 510 U.S. 497 (1993), and to "isolate and dispose of factually unsupported claims." Celotex Corp., at 323-324. "Summary Judgment serves as the ultimate screen to weed out truly unsubstantiated lawsuits prior to trial." Crawford-El v. Britton, 523 U.S. 574, 118 S. Ct. 1584, 1598, 140 L.Ed.2d 759 (1998).

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the portions of the pleadings, affidavits or other documentary evidence that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. Those facts that are material fact will be identified by the substantive law governing the case. Anderson, 477 U.S. at 248. Once the moving party meets its burden, the burden shifts to the non-moving party.

To defeat a motion for summary judgment, the non-moving party may not merely rely upon unsupported allegations made in their complaint, nor rely on "mere speculation or conjecture" to overcome a motion for summary judgment. Knight v. Fire Insurance Company, 804 F.2d 9, 12 (2d Cir. 1986), cert. denied, 480 U.S. 932 (1987). Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment. Bickerstaff v. Vassar College, 196 F.3d 435, 452 (2d Cir. 1999). Additionally, the evidence presented in opposition to summary judgment must be presented in a manner consistent with its admissibility at trial. See First National Bank Co. of Clinton, Ill. V. Insurance Co. of North America, 606 F.2d 760 (7th Cir. (1979) (in ruling on summary judgment

motion, the Court properly relied upon documents and exhibits identified by affidavit).  Unsworn statements of the parties, letters addressed to the litigants from third person, and hearsay which does not fall under one or more exceptions listed in Rules 803-805 of the Federal Rules of Evidence, may not be properly considered.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct 1598 2 L.Ed.2d 142 (1970); Benyene v. Coleman Security Service, Inc., 854 F.2d 1179 (9th Cir. 1988); Edward B. Marks Music Corp. v. Stansy Music Corp., 1 F.R.D. 720 (S.D.N.Y. 1941).  Moreover, plaintiff must point to "specific facts showing that there is a genuine issue for trial." Rule 56(e); Anderson, 477 U.S. at 248; see also  Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (Party may not rely on conclusory statements or an argument that the affidavits in support of the motion are not credible).  Plaintiff must also produce evidence to show the existence of every element essential to the case which it bears the burden of proving at trial.  Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp., 812 F.2d 141, 144 (3d Cir. 1987).

### III.    PLAINTIFF'S CLAIMS AGAINST COMMISSIONER ARMSTRONG, WARDEN MYERS AND MEDIC McALLISTER MUST BE DISMISSED DUE TO A LACK OF PERSONAL INVOLVEMENT IN THE ALLEGED CONSTITUTION VIOLATIONS

In order to prevail on a claim under Section 1983 against an individual, a plaintiff must prove that the defendant (1) acted under color of state law, (2) in a manner that deprived the plaintiff of "any rights, privileges, or immunity secured by the Constitution."  42 U.S.C. § 1983, see Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912-13, 63 L.Ed.2d 420 (1981). Section 1983 imposes liability for "conduct which 'subjects or causes to be subjected' the plaintiff to a deprivation of a right secured by the Constitution and laws."  Rizzo v. Goode, 423 U.S. 362, 370-71, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976).  Accordingly, "personal involvement of a defendant in an alleged constitutional deprivation is a prerequisite to an award

4

of damages under [Section] 1983." Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986). A plaintiff must demonstrate the defendant's direct or personal involvement in the actions which are alleged to have caused the constitutional deprivation. See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); and plaintiff must prove a tangible connection between the acts of the defendant and the injuries suffered. Bass v. Jackson, 790 F.2d 260, 262 (2d Cir. 1986). In the present case, the plaintiff makes a number of allegations that are directed against defendant DeGray. (See Complaint). However, he fails to allege (and cannot present any evidence) to demonstrate the personal involvement of defendants Armstrong, Myers, and McAllister in any of his claims. Accordingly, these defendants are entitled to summary judgment.

### A.    Commissioner Armstrong and Warden Myers

In March, 1999, defendant Armstrong was the Commissioner of the DOC and worked primarily out of the central DOC office in Wethersfield, Connecticut. (Attachment A, Affidavit of Defendant Armstrong, para. 3). There is no evidence that defendant Armstrong was at Northern on March 4 or 9, 1999 and there is no evidence that he had any involvement or notice of these incident(s) involving inmate Ziemba which are the subject of his Complaint. (Id., para. 10). Larry Myers was the Warden at Northern in March, 1999. (Attachment B, Affidavit of Defendant Myers, para. 2). He had no personal involvement in the incidents of March 4 and 9, 1999 and played no role in the decisions of Northern correctional staff during the incidents of March 4 or 9, 1999. (Id., para. 6).

Plaintiff has named Armstrong and Myers as defendants clearly on the basis of their supervisory position(s) within the DOC. However, it is well established that a supervisor may not be held liable under Section 1983 merely because [they were] in a high position of authority in the prison system. Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994). Moreover, even if his

subordinate allegedly committed a constitutional tort, a supervisor cannot be held liable under Section 1983. Leonard v. Poe, 282 F.3d 123, 140 (2d Cir. 2002). The general doctrine of respondeat superior does not suffice and a showing of some personal responsibility of the defendant is required. Al-Jundi v. Estate of Rockefeller, 885 F.2d 1060, 1065 (2d Cir. 1989) quoting Johnson v. Glick, 481 F.2d 1023, 1034 (2d Cir. 1983):

> A supervisory official may be personally involved in a section 1983 violation in several ways: (1) the official may have directly participated in the violation; (2) the official, after learning of the violation, may have failed to remedy the wrong; (3) the official may have created a policy or custom under which unconstitutional practices occurred; (4) the official may have been grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the official may have exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring. See *Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir 1995)*; see also *Williams v. Smith, 781 F.2d 319, 323-34 (2d Cir. 1986)*.

In this case, there are no facts supporting liability against defendants Armstrong and Myers on any of the foregoing theories. In his Complaint, the plaintiff apparently attempts to assert a claim for supervisory liability against defendants Armstrong and Myers based on prongs (2) and (5) of the above standard. For instance, the plaintiff alleges as follows:

> 10. From on or about August 11, 1998 until on or about January 20, 2000, the plaintiff was incarcerated at Northern C.I. where the prison officials inflicted severe unlawful acts of terrorism and retaliation against him, by assaulting him, denying him medical care, Inter Alia, and attempting to murder him.

> 11. Defendants Armstrong and Myers were made aware of the terrorism and retaliation by their agents against the plaintiff, through numerous letters, complaints, grievances, investigations and other documentation. As supervisory officials they failed to remedy the wrong and they each approved and promoted for their agents to terrorize the plaintiff and inflict retaliation against him.

> 12. The unlawful terrorism and retaliation was inflicted against the plaintiffs family members and directly against the plaintiff, because the plaintiff was excercising his right of access to the Courts, he filed complaints, grievances and had the CT. State Police investigate the prison officials committing crimes against him.

...

32. Defendants Armstrong and Myers were emphatically informed and made aware of the severe retaliation being inflicted by their agents against the plaintiff. They exhibited gross deliberate indifference to the rights of the plaintiff. They failed to act on all of the explicit facts and evidence. Their failure to act and actions directly lead to and caused the unconstitutional violations as described herein.

33. The Department of Correction Security Division investigation No. 98-38 is direct evidence in this case. (Complaint).

Plaintiff's attempt to impose supervisory liability on defendants Armstrong and Myers based on this theory (or theories) is legally unfounded for a number of reasons. First and foremost, both of these theories require that the supervisory official receive notice or information of an *ongoing constitutional violation* and fail to act appropriately on that information or knowledge. See Wright v. Smith, 21 F.3d 496, 502 (2d Cir. 1994) (While Commissioner Coughlin received a letter from the plaintiff which complained generally about the conditions of his confinement, the Commissioner was not put on actual or constructive notice of the specific violation); Showers v. Eastmond, 2001 U.S. Dist. LEXIS 6473 (S.D.N.Y. 2001) (No personal involvement found for Correctional Captain because he learned of the incident after the fact and was not in a position to present it); Crowder v. Lash, 687 F.2d 996, 1006 (7th Cir. 1982) (Commissioner's general knowledge of prison conditions and receipt of letters from plaintiff insufficient to impose liability). In the present case, the plaintiff asserts that Captain DeGray utilized excessive force during incidents of March 4 and 9, 1999. It is uncontroverted that defendant Armstrong had absolutely no knowledge or notice of the incident(s). As for Warden Myers, *after the incident of March 4, 1999 occurred*, he was notified that the plaintiff was involved in a disciplinary incident and placed in 4 point restraints. (Attachment B, Myers Affidavit, para. 7). However, as the Warden at the maximum security facility in the State of Connecticut, Warden Myers regularly received such notices. (Attachment B, Myers Affidavit,

para. 8).  Accordingly, this notice hardly constitutes adequate notice of an ongoing constitutional violation.  See Wright v. Smith, supra.

Despite the above, plaintiff apparently theorizes that he was the subject of ongoing "retaliation and terrorism" at Northern and that he provided notice of this treatment by way of letters and grievances to defendants Armstrong and Myers and they failed to act on that information.  (See Complaint, paras. 10-13).  However, this theory fails.  The Second Circuit has appropriately recognized "the ease with which claims of retaliation may be fabricated, [and the need to] examine prisoners' claims of retaliation with care."  Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995).  Accordingly, retaliation claims are subject to the standard that even in a pro se civil rights action, vague and conclusory allegations are insufficient to state a cause of action. Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (A complaint which alleges retaliation in wholly conclusory terms may be safely dismissed on the pleading alone.); see also Barr v. Abrams, 810 F.2d 358, 3673 (2d Cir. 1987) (Complaints relying on civil rights statutes are insufficient unless they contain some specific allegations.)  Utilizing this heightened standard, plaintiff's retaliation claims are fatally vague and conclusory.  He alleges that *the defendants* inflicted severe unlawful acts of terrorism and retaliation against him by assaulting him, denying him medical care, Inter Alia, and attempting to murder him.  (Complaint, para. 10).  However, the plaintiff fails to identify any particular action allegedly taken by the defendants. Additionally, the plaintiff fails to identify any other individuals or details or specific complaints to support these conclusory allegations.  He also fails to specify the particulars of the "notice" that he provided to defendants Armstrong and Myers.

The only specific allegation the plaintiff makes concerns DOC Security Division Investigation No. 98-38.  (Complaint, para. 33).  This investigation (see Attachment C)

concerned an incident that occurred at Northern in August, 1998 where the plaintiff was allegedly struck in the face by Captain Mangiafico.[1]  As a result of this investigation, it was found that Captain Mangiafico exercised poor judgment and he was disciplined and transferred to a different correctional facility (Attachment A, Armstrong Affidavit, paras. 6, 7).  While this incident of August, 1998 may suffice to put Commissioner Armstrong on notice that *Captain Mangiafico failed to use proper judgment during that particular incident in August, 1998*, it clearly fails to support a conclusion that Commissioner Armstrong was on notice of ongoing and continuing "retaliation and terrorism" against the plaintiff.

Warden Myers was not the Warden of Northern in August, 1998 and did not participate in the Security Division Investigation or imposition of discipline to Captain Mangiafico. (Attachment B, Myers Affidavit, para. 4).  Therefore, it is unfounded to suggest that this incident and subsequent investigation placed him on notice of ongoing "retaliation and terrorism." *Indeed, defendant Myers did not become Warden at Northern until February 1, 1999,* approximately seven months after this incident and approximately five weeks before the incidents in plaintiff's Complaint.  (Attachment B, Myers Affidavit, para. 3).  Accordingly, plaintiff cannot allege, or demonstrate, that Warden Myers was "on notice" of any mistreatment.

At the very most, this August, 1998 incident involving Captain Mangiafico put Commissioner Armstrong on notice of an isolated incident of misconduct by one correctional official who was subsequently transferred out of Northern.  Indeed, plaintiff cannot point to a single letter, or grievance, or complaint which allegedly places the defendants on notice of the incidents that are set forth in his Complaint.

---

[1] Plaintiff has a pending lawsuit concerning this matter, <u>Ziemba v. Armstrong, et al.</u>,3:98CV2344 (JCH)(HBF).

Concerning plaintiff's conclusory allegation of attempted murder (Complaint, para. 10), plaintiff originally alleged in <u>Ziemba v. Armstrong</u>, 3:98CV2344 (JCH)(HBF) that in September, 1998, Northern officers placed razor blades in his food.  (Attachment D, Plaintiff's Amended Complaint, August 18, 1999).   In an Amended Complaint, this claim was subsequently withdrawn.[2]  Because the plaintiff does not believe in this allegation to continue to pursue it in the above lawsuit, it is untenable to suggest that this unfounded allegation serves as sufficient "notice" to the supervisory defendants in this case of ongoing "retaliation and terrorism." Further, this "attempted murder" allegation, as well as plaintiff's various other complaints concerning denial of medical care at Northern, were investigated in October, 1998 by DOC's Director of Medical Services, Dr. Edward Blanchette.   (Attachment E, Blanchette Report, 10/26/98).  Dr. Blanchette found that despite the plaintiff's allegations that medical care was denied to him on a number of occasions, the medical record clearly documented an appropriate and timely response to all of his medical/mental health requests.  (<u>Id</u>.)   In regard to the "attempted murder" allegation, Dr. Blanchette noted no area of bleeding or laceration in the plaintiff's mouth; abdominal x-rays which were not consistent with metal fragments and a stool specimen submitted by the plaintiff on September 30, 1998 which was covered with fresh, bright red blood, strongly suggesting that the blood was added to the specimen after it was collected. (<u>Id</u>.)  Based on his investigation, Dr. Blanchette concluded that the evidence strongly suggested that the plaintiff fabricated this incident.  (<u>Id</u>.)

In sum, plaintiff cannot put forth any competent evidence to suggest that there was a pattern of "retaliation and terrorism" against him at Northern that put the supervisory defendants

---

[2] The defendants have not attached the Amended Complaint.

on notice of his mistreatment. To the contrary, plaintiff's allegations of denial of medical care and "attempted murder" and the subsequent investigation into these allegations, put the supervisory defendants on notice that the plaintiff was prone to fantastic allegations regarding misconduct by correctional officials. Based on the foregoing, defendants Armstrong and Myers are entitled to summary judgment.

### B.    Medic McAllister

Presumably, the plaintiff raises an Eighth Amendment claim for inadequate medical treatment against defendant McAllister. Inadequate medical treatment can constitute cruel and unusual punishment. See, e.g., Estelle v. Gamble, 429 U.S. 97, 50 L.Ed.2d 251, 97 S.Ct. 285 (1976). In order to succeed on an Eighth Amendment claim for inadequate medical treatment, however, an inmate must show that a prison official acted with (i) "deliberate indifference" to (ii) an inmate's "serious medical needs." See, e.g., Helling v. McKinney, 509 U.S. 25, 32, 125 L.Ed.2d  22, 113 S.Ct. 2475 (1993); Estelle, 429 U.S. at 104-05. "Objectively, the deprivation must be 'sufficiently serious' in the sense that 'a condition of urgency, one that may produce death, degeneration, or extreme pain' exists." See Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996) (quoting Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1988)). Subjectively, the charged official must have a mental state "equivalent to criminal recklessness," in that the official must know of and disregard the excessive risk to the inmate's health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must draw the inference. Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998). The only reference to defendant McAllister in plaintiff's Complaint is found in paragraphs 17 and 18. Specifically, plaintiff alleges that on the morning of March 4, 1999 defendants McAllister and DeGray went to the plaintiff's cell with a team of guards and

"totally denied him medical care." (Complaint, paras. 17 and 18). However, the actual evidence directly contradicts this allegation and demonstrates that defendant McAllister responsively and appropriately addressed the plaintiff's medical complaints. On the morning of March 4, 1999, Captain DeGray requested that defendant McAllister see the plaintiff due to the plaintiff's complaint that he could not walk due to a "broken foot." (Attachment F, DeGray Incident Report, 3/4/99). Defendant McAllister responded to the request and initially saw the plaintiff at approximately 10:55 a.m. on March 4, 1999. (Id.) Defendant McAllister was familiar with the plaintiff's complaint of a broken foot as inmate Ziemba had made that claim before. (Attachment H, McAllister Affidavit, para. 4). Defendant McAllister also knew that the plaintiff had x-rays taken of his foot on September 28, 1998 which revealed degenerative abnormalities but did not reveal any signs of a fracture. (Id., para. 4).

At the request of Captain DeGray, on March 4, 1999 defendant McAllister conducted an assessment of plaintiff's foot and concluded that the plaintiff was capable of walking. (Attachment G, McAllister Medical Incident Report, 3/4/99, 10:55 a.m.). This assessment was proven to be accurate as inmate Ziemba is seen standing and walking without difficulty on various occasions in the enclosed videotape. (Attachment M, Videotape).[3] Additionally, numerous correctional officials noted the plaintiff to be walking and standing before, and after, the March 4, 1999 incident without any physical difficulty. (Attachment F, DeGray Incident Report, 3/4/99) (On 3/3/99, plaintiff walked three times farther than the shower to an interview room); (Attachment G, McAllister Medical Incident Report, 3/4/99) (Plaintiff standing at his

---

[3] It should be noted that the chronology of the incidents on the videotape is confusing. The first incident, narrated by Lieutenant Oglesby, occurred on the evening of March 4, 1999. The second incident, narrated by Captain DeGray, occurred on the morning of March 4, 1999. In the remainder of the incidents, the time and date is accurately stated on the videotape.

door without any difficulties); (Attachment I, Rollins Incident Report, 3/4/99) (Escorted plaintiff to interview room on 3/3/99 and plaintiff reported that he broke his foot as a kid and now had calcium deposits, yet could walk); (Attachment J, Officer Palonis, Disciplinary Report, 3/4/99) (Although plaintiff stated he could not stand or walk, this officer observed him walking in cell to press intercom button); (Attachment K, Hollingworth Incident Report, 3/4/99) (Plaintiff walked from his desk at the far end of the cell to the trap at the cell door). It is evident that the plaintiff did not suffer from a broken foot and contrary to his assertions, was capable of walking. The plaintiff cannot demonstrate that he suffered from a sufficiently serious medical condition and that defendant McAllister acted with deliberate indifference to this condition.

In addition to his complaint of a foot problem, when initially seen by defendant McAllister, the plaintiff also complained of a "laceration to his wrist." (Attachment L, McAllister Medical Incident Report, 3/4/99, 12:25 p.m.). This condition was also assessed by defendant McAllister who concluded that he had a small scratch on his left wrist. (Id.) Defendant McAllister determined that a benzo ointment treatment was appropriate for the plaintiff and provided that to him. (Id.) It cannot be reasonably asserted that the plaintiff's wrist condition constituted a sufficiently serious medical condition and that defendant McAllister was deliberately indifferent to that condition. To the contrary, the uncontroverted evidence demonstrates that this condition was assessed and treated by defendant McAllister. Accordingly, defendant McAllister is entitled to summary judgment.

## IV.    LIABILITY OF CAPTAIN DeGRAY FOR ALL OF THE CLAIMS ASSERTED BY PLAINTIFF IS BARRED BY THE DOCTRINE OF QUALIFIED IMMUNITY

The plaintiff's allegations in his Complaint are directed primarily against Captain DeGray and presumably assert that he utilized excessive force in violation of the Eighth Amendment. However, the facts and evidence in this case reveal no basis for the imposition of

liability upon Captain DeGray for any alleged violation of the Eighth Amendment.  Additionally, even if the Court indulges in this assumption, Captain DeGray is entitled to immunity from liability under the doctrine of qualified immunity.

The qualified immunity defense is a well-established doctrine that protects government officials performing discretionary functions from liability for civil damages, "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have know." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Siegert v. Gilley, 500 U.S. 226, 111 S.Ct. 1789, reh'g denied 111 S.Ct. 2930 (1991).  Even where the contours of the plaintiff's federal rights are clearly established at the time of the defendant's acts, "the defendant may enjoy qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights." Robinson v. Via, 821 F.2d 913, 921 (2d Cir. 1987).  As our Court of Appeals has observed, "the standard governing the availability of this defense has evolved into one of objective reasonableness, designed to 'permit the resolution of many insubstantial claims on summary judgment.'"  Robinson, supra at 290 (quoting Harlow, 456 U.S. at 818).

Recently, the Supreme Court has reiterated that a qualified immunity defense should be ruled upon:

> … early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive.  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed 2d 411 (1985).  The privilege is an "immunity from suit rather than a mere defense to liability; and like an absolute immunity; it is effectively lost if a case is erroneously permitted to go to trial." Ibid.  As a result "we repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curium).

Saucier v. Katz, ___ U.S. ___, 121 S.Ct. 2151, 2156 (2001); see also, Cartier v. Lussier, 955 F.2d 841, 843 (2d Cir. 1992).

In <u>Saucier</u>, plaintiff was a demonstrator who was arrested by a military police officer as he attempted to unfurl a banner at an event at which the Vice President Gore was to speak.  121 S.Ct. at 2154.  As he did so, officers grabbed him from behind, one on each arm, and removed him half-walking, half-dragging him with his feet "barely touching the ground" to a military van where he was shoved or thrown inside.  <u>Id</u>.  He brought an action against the officers alleging, <u>inter alia</u>, excessive force.

While the district court and Court of Appeals for the Ninth Circuit denied Officer Saucier's qualified immunity defense on the basis that there existed disputed issues of material fact as to whether excessive force was used, the Supreme Court reversed and remanded.  In doing so, the Court emphasized that the qualified immunity analysis could not be merged into the question of whether unreasonable force was used in making the arrest.  <u>Id</u>. at 2158.

> The qualified immunity inquiry … has a further dimension.  The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.  It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.  An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances.  If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

<u>Id</u>.

The facts in <u>Saucier</u> are quite similar to the facts in this case and clearly apply to the claims against Captain DeGray.  The goal of qualified immunity remains constant:  to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment."  <u>Id</u>. at 2156 quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

**A.**     **Plaintiff Cannot Demonstrate The Deprivation Of A Constitutional Right**

Applying the qualified immunity analysis to plaintiff's claims that Captain DeGray used excessive force in violation of the Eighth Amendment prohibition against cruel and unusual punishment, it is evident that plaintiff is unable to pass the threshold question in the qualified immunity analysis:   do the facts alleged show that the defendant's conduct violated a constitutional right?  County of Sacramento v. Lewis, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1988); see also, Wilson v. Layne, 526 U.S. 603, 609, 199 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

42 U.S.C. § 1983 provides for liability for the deprivation, under the color of state law, "of any rights, privileges or immunities secured by the Constitution."  The Eighth Amendment sets constitutional limits on conditions of imprisonment.  "Not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny, however.  After incarceration, only the 'unnecessary and wanton infliction of pain' constitutes cruel and unusual punishment forbidden by the Eighth Amendment."  Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting Ingraham v. Wright, 430 U.S. 651, 975 S.Ct. 1401, 51 L.Ed.2d 711 (1977)).

To demonstrate an Eighth Amendment violation, a plaintiff must make two showings. First, the alleged punishment must be "objectively, sufficiently serious."  Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting Wilson v. Seitzer, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)).  The objective component is "context specific, turning upon 'contemporary standards of decency.'"  Blyden v. Mancusi, 186 F.3d 252, 263 (2d Cir. 1999) (quoting Hudson v. McMillian, 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (quoting Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).

To satisfy the subjective requirement, the inmate must show that the prison officials' actions were characterized by "wantonness." Davidson v. Flynn, 32 F.2d 27, 29 (2d Cir. 1994); Whitley v. Albers, 475 U.S. at 319. In excessive force cases, the "wantonness" inquiry turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Blyden v. Mancusi, 186 F.3d at 262 (quoting Hudson v. McMillian, 503 U.S. at 7). "Because decisions to use force often are made under great pressure and involve competing interests the good-faith standard is appropriate." Blyden v. Mancusi, 186 F.3d at 263.

While a significant injury is not a prerequisite to an Eighth Amendment violation, "a *de minimus* use of force will rarely suffice to state a constitutional claim." Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates a prisoner's constitutional rights." Id., (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

Applying these standards to Ziemba's claim of excessive force against Captain DeGray, it is evident that no constitutional claim has been stated in the first instance. The videotape of the pertinent incidents is the best evidence and fails to depict conduct that could possibly be construed as violative of contemporary standards of decency. (Attachment M, Videotape of Incidents). The plaintiff asserts that Captain DeGray utilized excessive force on March 4 and 9, 1999 when escorting him to the showers. (Complaint, paras. 14-22, 28-29). In fact, on both occasions the videotape clearly depicts the plaintiff's non-compliance with direct orders to walk to the showers. Additionally, the videotape shows two non-violent escorts for a total of approximately ten yards to the showers. Indeed, the videotape demonstrates that Captain DeGray acted reasonably, and professionally, despite the plaintiff's uncooperation and

misbehavior. The videotape also clearly shows that Captain DeGray placed the plaintiff into four point restraints for his own safety, not for any punitive purposes as alleged by the plaintiff. Thus, plaintiff's claim fails to satisfy the first prong of the Eighth Amendment excessive force analysis.

Similarly, plaintiff's allegations will not support a finding of "wantonness" notwithstanding Ziemba's characterization of Captain DeGray's actions as "malicious." To determine whether the defendant acted maliciously, as opposed to a good faith effort to maintain or restore discipline, requires an examination of: the extent of the plaintiff's injuries, the need for the application of force and the amount of force used, the threat reasonably perceived by the defendant, and any effort made by the defendant to temper the severity of a forceful response. Whitley v. Albers, 475 U.S. at 321 (1986). The defendants' use of force--albeit minimal--to bring him to the shower on both occasions was reasonable as the plaintiff professed an inability to walk. (Complaint, paras. 19, 20). Moreover, Captain DeGray appropriately summoned medical staff and determined that plaintiff's assertion was not true. Under these circumstances, a violation of the Eighth Amendment simply cannot be found.

In view of these facts, plaintiff is unable to establish a constitutional violation in the first instance. Accordingly, he is entitled to judgment in his favor.

### B.    Captain DeGray's Actions Were Objectively Reasonable Under The Circumstances

Even if it is accepted, for the sake of argument, that plaintiff has alleged a cognizable claim of excessive force violative of the Eighth Amendment, the second part of the qualified immunity analysis as set forth by the United States Supreme Court dictates that Captain DeGray is entitled to judgment in his favor in this case. "[E]ven where the law and the scope of permissible official conduct are clearly established, the defense of qualified immunity will

protect a government official if it was 'objectively reasonable' for him to believe his acts were lawful." Robinson v. Via, 821 F.2d 913, 921 (2d Cir. 1987).

It is frequently stated that the doctrine of qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 340 (1986). "The objective reasonableness test is met – and the defendant is entitled to immunity – if 'officers of reasonable competence could disagree' on the legality of the defendant's action." Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995).

The most compelling evidence as to the objective reasonableness of Captain DeGray's conduct with respect to inmate Ziemba is the videotape of the incident. There can be no dispute that the defendant's conduct was reasonable and was precipitated by Ziemba's own misconduct in failing to comply with lawful orders. Captain DeGray's intervention is precisely the type of situation to which the doctrine of qualified immunity is meant to apply. The doctrine "acknowledge[s] that reasonable mistakes can be made as to the legal constraints on particular [correctional officer] conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation he confronts." Saucier v. Katz, 121 S.Ct. at 2158. Thus, even if it is accepted for the sake of argument that Captain DeGray erred, he is still entitled to qualified immunity from liability.

## V.    THERE EXISTS NO EVIDENCE TO SUPPORT PLAINTIFF'S VARIOUS OTHER CLAIMS AGAINST CAPTAIN DeGRAY

Interpreting his Complaint in the most favorable light, inmate Ziemba also alleges that Captain DeGray, along with other correctional staff, deprived him of medical care in violation of his constitutional rights. The record clearly establishes, however, that plaintiff's medical needs were thoroughly and adequately attended to. (Medical Incident Report, 3/4/99 to 3/9/99; see also, Attachment M, Videotape). Further, the plaintiff alleges that defendant DeGray placed the

plaintiff into restraints for punitive purposes. As demonstrated in the videotape, there is simply no evidence to support this assertion. Moreover, the decision to place, and release, an inmate from restraints is a subjective decision by the correctional officer for which Qualified Immunity is appropriately suited. See Sims v. Mashburn, 25 F.3d 580, 585 (11th Cir. 1994) (When inmates are placed in restraints for behavioral purposes, prison officials are required to make somewhat subjective judgments as to when the inmate's behavior has been stable for a sufficient period of time so as to allow for the inmate's release); see also Palozie v. Armstrong, et al., 3:95CV1387 (JBA)(HBF) (Nine day placement in four point restraints found not to violate plaintiff's constitutional rights).

Moreover, plaintiff sets forth vague, conclusory allegations of destruction of legal materials. These allegations are wholly insufficient to satisfy the standard set forth in Lewis v. Casey, 116 S.Ct. 2174 (1996).

## VI.   DEFENDANTS ARMSTRONG, MYERS, AND McALLISTER ARE ALSO ENTITLED TO QUALIFIED IMMUNITY

As stated, where a qualified immunity defense is raised, a court must make a two-fold inquiry. First, the court must determine whether the facts, "taken in the light most favorable to the party asserting the injury, … show the officer's conduct violated a constitutional right." Saucier v. Katz, 533 U.S. 194, 201, 150 L.Ed.2d 272, 121 S.Ct. 2151 (2001). Second, even where such a constitutional right has been violated, the government employee is entitled to qualified immunity "'if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law.'" Anderson v. Recore, 317 F.3d 194, 197 (2d Cir. 2003) (quoting Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 250 (2d Cir. 2001)); see also Giacalone v. Abrams, 850 F.2d 79 (2d Cir. 1988).

It strains the imagination to suggest that any of the defendants violated the plaintiff's constitutional rights during this incident(s). However, even if this assumption is made, it cannot be reasonably argued that defendants Armstrong and Myers--who did not participate in the events alleged in plaintiff's lawsuit--acted in an objectively unreasonable manner. To the contrary, as DOC supervisors, they appropriately relied on Northern correctional staff to properly discharge their responsibilities during this incident(s). Additionally, during defendant McAllister's very limited interaction with the plaintiff it is certainly not evident that his actions (i.e., assessing and treating the plaintiff's medical complaints) were violative of the law. Accordingly, defendants Armstrong, Myers, and McAllister are entitled to Qualified Immunity.

## VII.   <u>CONCLUSION</u>

For all of the foregoing reasons, the undersigned defendants urge the Court to grant summary judgment in their favor.

<div style="margin-left:40%;">

DEFENDANTS,
John Armstrong, Kevin DeGray, Larry Myers, and Reginald McAllister

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: _____/s/_____
Matthew B. Beizer
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Federal Bar #ct16304
E-Mail:  matthew.beizer@po.state.ct.us
Tel:  (860) 808-5450
Fax:  (860) 808-5591

</div>

## <u>CERTIFICATION</u>

I hereby certify that a copy of the foregoing was mailed to the following this 28th day of

July, 2004:

Duane Ziemba #128963
Northern Correctional Institution
P.O. Box 665
Somers, CT  06071

_____/s/_____
Matthew B. Beizer
Assistant Attorney General