back, <u>with their full weight</u>. You can hear the plaintiff stating how "he is laying in piss", "they wouldn't let him use the bathroom", and he asked for "dry clothing". He is on the bare steel bunk, clothed in only a pair of underwear. The guards hurt his seriously injured foot and back, and his testicles, plaintiff is screaming real bad in pain. Lieutenant Oglesby, says on camera: "inmate is absolutely clothed at this time." We know that this is <u>incorrect</u>, because video shows plaintiff is clothed in only a pair of underwear. All genuine material facts.

   The facts reveal, that it is lieutenant Oglesby who was the supervisory official of these abhorrent acts. Who <u>is</u> a defendant in the "prior action": Ziemba V. Armstrong, et al. No. 3:98 CV 2344 (JCH)(HBF) — who in August of 1998 (guilt immeasurable) tortured and abused the plaintiff in the 22 hour four point restraint. <u>See</u> Exhibit 1. Emphasis: It is defendant Armstrong who failed to take any disciplinary action against these "prior violations". And it is, as evidenced herein, defendants Armstrong and Myers who are ultimately responsible for these subsequent violations, abuses, and profound injuries. They knowingly

#21

left the plaintiff in Northern, an extremely hostile and dangerous environment.

   March 5, 1999 the plaintiff was released from the four point restraints, and denied bedding, clothing, and medical treatment. Therefore, on March 6, 1999 plaintiff "refused to give up his lunch trash" and was given another charge for "Disobeying A Direct Order". <u>See these facts</u> at Exhibit 17. **These** are <u>material facts</u> substantiating that even on March 6, 1999 at lunch time, plaintiff continued to be abused, he was locked in the cell with no bedding, no clothing but his urine soaked underwear, and still he was denied needed medical treatment.

   March 9, 1999 the retaliation continued. Once again, defendant DeGray went to the plaintiff's cell with a team of guards, to search plaintiff's cell. The plaintiff could not walk due to his serious medical condition. <u>ID.</u> <u>See</u> video: prior to the physical force on plaintiff, <u>no medical</u> staff examined plaintiff. Defendant DeGray ordered force to be used on plaintiff due to he could not walk. Excessive force was utilized which painfully ripped open all of

#22

the plaintiff's healing injuries from the March 4, 1999 excessive force. See Video.

March 19, 1999 is the first time that any medical staff saw the plaintiff and examined his seriously injured foot/ankle. Which was seriously injured on March 3, 1999 I.D. On this date (16 days later) nurse witnessed that: "® foot swelling ⊕ will place on MD sick call list for follow up, Tylenal 650 mg 15 day". See Exhibit 19., Medical Records.
March 22, 1999 (19 days later) Dr. Vigneron saw the plaintiff and examined his foot/ankle. He witnessed: "Much swelling" and ordered "a wheel chair". And on September 27, 1999 at Uconn the plaintiff received major foot surgery.

## A. Each defendant Was Personally Involved In The Constitutional Violations.

The defendants argue that they are entitled to summary judgment with respect to plaintiff's claimes against Commissioner Armstrong, Warden Myers and Medic McAllister, due to a lack of personal involvement in the alleged Constitutional violations. Defs' Mem., at 4. The defendants are incorrect as a matter of law for numerous reasons.

#23

10. Defendants Armstrong and Myers were each personally involved in the Constitutional violations, because they knowing and deliberately left the plaintiff in Northern, an extremely hostile and dangerous environment, inter alia.

Please See this Court's Ruling on Motion To Dismiss [Doc.#27] dated June 10, 2003 (JCH) - page 11., "The plaintiff alleges that, prior to the March 1999 incidents, he made Commissioner Armstrong and Warden Myers aware of other retaliatory acts by officials at Northern through letters, grievances and complaints." The plaintiff claims that Commissioner Armstrong and Warden Myers <u>failed to take action to remove him from the hostile and dangerous environment at Northern and, as a result, he suffered additional injuries</u>. These allegations meet the requirement for alleging supervisory liability."

  The plaintiff herein, is now presenting evidence demonstrating this personal involvement of defendants Armstrong and Myers.

Defendant Armstrong. He admits that he was responsible "for the supervision and training, discipline and control of all persons working for the Department of Correction". Armstrong Depo.,

#24

Exhibit 2, at 38.

He also admits that he was responsible "for administration of all facilities, program and operation of the agencies". Amstrong Depo. Exhibit 2, at 11-12.

He also admits that he was responsible for administering, coordinating and controlling the operations of the Department, that he: "Would do that through the issuance of administrative directives and delegation of his authority through those directives." (emphasis added) Armstrong Depo., Exhibit 2, at 12.

> A supervisory official defendant may be personally involved in a Section 1983 violation in the following ways:
> (1) the defendant participated directly in the alleged Constitutional violation;
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in

#25

supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that Unconstitutional acts were occuring. <u>Williams V. Smith</u>, 781 F.2d 319, 323-24 (2d Cir. 1986); <u>Colon V. Coughlin</u>, 58 F.3d 865, 873 (2d Cir. 1995).

The evidence in this case undoubtedly substantiates that defendant Armstrong and Myers face civil liabilities, for each of the above 1 through 5 Section 1983 Violations.

The prior civil action: Ziemba V. Armstrong, et al. No. 3:98 cv 2344 (JCH)(HBF) — <u>See</u> Exhibit 1. And <u>See</u> Defs' Mem., Attachment C, the DOC Security Division Report. <u>ID.</u> It was, in fact, substantiated that "<u>Northern</u>" Captain Mangiafico used excessive force against plaintiff, that plaintiff at "<u>Northern</u>" was denied medical care, that at "<u>Northern</u>" plaintiff was physically tortured for more than 22 consecutive hours in four point restraints, that three "<u>Northern</u>" guards "failed to truthfully report what took place". And that the "<u>Northern</u>"

#26

medical staff "neglect[ed] to do a thorough assessment of inmate Ziemba" and failed to document the results. <u>Defendant Armstrong's Constitutionally unacceptable responses to all of this prior Unconstitutional conduct, was</u>:
(1) He blatantly rejected all of his Security Division's findings, Armstrong Depo., Exhibit 2., at 15-16; 185-94; 234-37;
(2) He knowingly, with disgusting deliberate indifference to plaintiff's life, safety and well being did not remove him from "<u>Northern</u>" a confirmed extremely hostile and dangerous environment; (3) He failed to take any meaningful discipline against any of his subordinates guilty; (4) He failed to provide any meaningful training to remedy the wrong; (5) He failed to hold anyone accountable for the excessive force and physical torture of plaintiff; and (6) He failed to hold anyone accountable for the medical indifference and neglect.

   <u>In</u> addition to these indicated above violations, defendant Armstrong had, even further, actual and constructive notice of the Unconstitutional violations through the following facts: Pamela Ziemba, plaintiff's mother, sent to defendant

#27

Armstrong a letter dated September 1, 1998, which in part states: "Why put him back, in a facility where there is animosity between officials and him?" "Please, you are the only one to stop this travesty, my son is being destroyed, please step in." Exhibit 4.    Despite this September 1st letter, defendant Arstrong failed to remove the plaintiff from <u>Northern</u>. Ludicrously, the only action he took was he responded to Ms. Ziemba, and stated: "thank you for sharing your thoughts with me". Also Exhibit 4.

   Defendant Armstrong was also informed by the plaintiff filing an emergency grievance dated August 31, 1998, which addressed the <u>"Northern"</u> retaliation, and how: "A very high number of <u>Northern</u> officials are extremely biased against him and have vandetta against him, the facts are stated, this grievance is on officials forcing me to stay at Northern, this is deliberate indifference, gross negligence". <u>See Exhibit 5.</u>

   Additionally, defendant Armstrong was informed by the plaintiff filing two grievances dated February 8, 1999, on: "Investigations have been

#28

intentionally hindered and not adequate". Exhibit 5.

Additionally, defendant Armstrong was informed by the plaintiff sending him a letter dated September 1, 1998, which specifically addressed the retaliation by his staff and how: "At Northern one day after being transferred here on 8/12/98 I was assaulted by staff and seriously abused, when are you John Armstrong as the Commissioner a Supervisory Official going to stop ignoring this abuse by DOC staff?" Exhibit 5.

Additionally, defendant Armstrong was informed by the plaintiff sending him a letter dated September 3, 1998, which also specifically addressed the retaliation and how: "You are very well informed of all past issues and why I am now at Northern. On 8/12 I was assaulted by a Captain at Northern and abused by staff, when are you as the Commissioner going to stop this abuse by staff and unlawful acts?" Exhibit 5.

Additionally, defendant Armstrong was informed by the plaintiff sending him a letter dated September 14, 1998, stating: "Why are you forcing

#29

me to live in the exact same setting that I was just assaulted and seriously abused by Officials?" Exhibit 5. Defendant Armstrong did receive the plaintiff's meritorious complaints, because he Ostensibly -- responded with his letters dated September 10, 23 and 29, 1998, October 20, 1998 and September 9, 1999. Exhibit 5.

<u>Id.</u> On September 27, 1998 at Northern, in further retaliation the plaintiff's food was tampered with. The Northern prison Officials maliciously put pieces of razor blades in his food. The plaintiff sustained very serious injuries. See Exhibit 12 and Plaintiff's Affidavit at 6.
Defendant Armstrong was informed of this further -- very grave -- retaliation, but he still failed and refused to remove the plaintiff from Northern. See Exhibit 5, Armstrong's letter to plaintiff dated October 20, 1998.

In addition, defendant Armstrong was informed by the plaintiff wrote a letter to defendant Myers dated February 19, 1999, with an attached emergency grievance also dated February 19, 1999. Copies of these documents went to defendant Armstrong. <u>See</u> Exhibit 7. And these documents

#30

very specifically address the acts of retaliation at <u>Northern</u> by defendant Captain DeGray. Exhibit 7. Incredibly, defendant Armstrong still failed to remove the plaintiff from Northern, an undeniable extremely hostile and dangerous environment.

These are abundant genuine issues of material fact which prove defendant Armstrong's personal involvement. Supervisory liability may be imposed when an official has actual or constructive notice of Unconstitutional practices and demonstrates "gross negligence" or "deliberate indifference" by failing to act. <u>McCann v. Coughlin</u>, 698 F.2d 112, 125 (2d Cir. 1983); (Supervisor may be found "grossly negligent" or "deliberately indifferent" if he "knew or should have known" of the underlying facts); <u>Rodriguez v. State of Connecticut</u>, 169 F. Supp. 2d 39, 44-45 (D. Conn. 2001) (JCH): Ruling on Defendants' Motion for Judgment on the pleadings [DKT. No. 193] (May 8, 2003, Judge Hall) at 14-15. On this record evidenced herein, the

#31

plaintiff would be entitled to Summary judgment in his favor.

To see one more even further example of defendant Armstrong's personal involvement, he admits that he was responsible for administering, coordinating and controlling the operations of the Department, that he: "Would do that through the issuance of administrative directives and delegation of his authority through those directives". Armstrong Depo., Exhibit 2, at 12.

It is defendant Armstrong's created policy and custom of Administrative Directive 6.5 Use of Force, under which the Unconstitutional practies occurred of the plaintiff being horribly, grotesquely and painfully injured and tortured for more than 25 consecutive hours in the Full Stationary Restraints.

The Administrative Directive 6.5 Use of Force effective date August 3, 1998, signed by defendant Armstrong on June 25, 1998, is the

#32

Directive which was in effect during the incidents pertinent hereto. <u>See</u> Exhibit 24. Specifically this Directive was Unconstitutionally deficient due to the following facts:

(1) <u>It did not provide</u>; "Each person involved in a use of force shall be attentive to and conscious of change in inmate behavior or demeanor that might indicate physical distress or any other physical side effect related to the use of force." (6.5 Use of Force Directive - Revised - 2003 at 4.(I) does provide this, See Exhibit 25);

(2) <u>It did not provide</u>; "This procedure shall be implemented in collaboration with medical staff. The inmate shall be placed on a mattress that is positioned on top of a bed frame and the inmate shall be positioned face up. Arms and legs shall be restrained such that discomfort to the inmate is minimized". (6.5 Use of Force Directive - Revised - 2003 at 8.(4) does provide this, **See Exhibit 25.**);

(3) <u>It did not provide</u>; "A post incident medical evaluation shall be conducted upon placement and at the indicated intervals: (a) Circulation - every 15 minutes; (b) respiration - every 15 minutes; (C) pulse - every 30 minutes; (d) blood

#33

pressure — every 60 minutes; and (c) temperature every 120 minutes." (6.5 Use Of Force Directive — Revised - 2003 at 8.(4) does provide this, See Exhibit 25);

(4) <u>It did not provide</u>; "These checks shall be executed and documented by Health Services Staff in the inmate health record. At least every two (2) hours the restraints must be totally removed or serially removed and each limb of the inmate moved to full range of motion and assessed for trauma, blood circulation, and/or diminished nerve Sensation". (6.5 Use Of Force Directive - Revised - 2003 at 8.(4) does provide this, See Exhibit 25);

(5) <u>It did not provide</u>; "The inmate shall be offered and allowed to attend to bodily functions at a minimum, every two hours. Restrained inmates shall receive normally scheduled meals. Meals shall be bite-sized and served on paper plates, unless a physican has ordered alternate dietary arrangements. Immediate removal of restraints shall be initiated where a decompensating physical condition of a restrained inmate contraindicates restraints." (6.5 Use Of Force Directive - Revised - 2003 at 8.(4) does

#34

provide this, see Exhibit 25.).

In 2003, defendant Armstrong corrected <u>thus Unconstitutionally deficient</u> (policy and custom) 6.5 Directive, he revised it accordingly. Which is an admission of guilt to how the original version was indeed deficient. Please compare the original 6.5 Directive Exhibit 24, with the revised 2003 version Exhibit 25.

<u>It</u> is thus Unconstitutionally deficient 6.5 Directive -- that directly contributed and caused the plaintiff to be horribly, grotesquely and painfully injured by the use of force (See the Video), and physically tortured in the four point restraints - for the excessive and totally unjustified more than 25 consecutive hours -- painfully tied down by his limbs spread eagle, denied medical care, denied a mattress, denied food, denied liquids and denied use of the toilet facilities. <u>Id.</u> Defendant Armstrong created this policy and custom under which these Unconstitutional practices occurred. <u>Williams V. Smith</u>, 781 F.2d 319, 323-24 (2d Cir. 1986); <u>Colon V. Coughlin</u>, 58 F.2d 865, 873 (2d Cir. 1995).

#35

With respect to defendant Myers. The material facts of his personal involvement are equally evincing -- overwhelmingly. He was placed on actual and constructive notice by the plaintiff filing an emergency grievance dated February 16, 1999 stating: "Emergency, please move me out of West a Unit away from Captain DeGray. Because this Captain is inflicting severe retaliation against me. He has repeatedly threatened me, has repeatedly recklessly searched me/my cell, etc. etc. Due to he is best friends with Captain Mangiafico." Defendant Myers unjustifiably denied this emergency grievance on February 26, 1999 (only 6 days prior to the retaliatory March 4, 1999 excessive force) See Exhibit 6. Id.

Additionally, defendant Myers was placed on actual and constructive notice by the plaintiff filing a 2nd emergency grievance attached to a letter dated February 19, 1999. The letter was date stamped "Received Feb 23, 1999" (only 9 days prior to the retaliatory March 4, 1999 excessive force), and the emergency grievance defendant Myers unjustifiably denied on March 1, 1999 (only 3 days prior to the excessive force). See plaintiff's February 19, 1999 letter, Exhibit 7, which in part states: "Last week when you toured I

#36

informed you of this very serious matter, but still nothing has been done, please move me away from Captain DeGray immediately". The letter very specifically addressed the retaliation being inflicted against the plaintiff, by defendant Captain DeGray. And See the attached thereto emergency grievance which states: "My life, safety and well being is in immenent danger. Please move me away from DeGray - please stop this severe retaliation". Exhibit 7. Notwithstanding this clear actual and constructive notice, defendant Myers failed to take action to remove the plaintiff from the extremely hostile and dangerous environment, and he failed and refused to stop the retaliation. Id.

Additionally, defendant Myers was placed on actual and constructive notice by the plaintiff filing a 3rd emergency grievance dated February 27, 1999, Exhibit 8. Which states, in part, following: "This is a justified emergency grievance. Please take action to stop the confirmed retaliation. My life's been threatened." On March 1, 1999 defendant Myers responded to this emergency grievance and incredibly he stated: "Re: Non grievable". (Only 3 days prior to the retaliatory March 4, 1999 excessive force.). Id.

#37

These are abundant genuine issues of material fact (that alone give rise to a Rule 56(g) order) substantiating defendant Myers' personal involvement, his supervisory liability. Id. Cases cited. He was aware of the retaliatory acts, and he failed to take action to remove plaintiff from the hostile and dangerous environment, as a result, plaintiff suffered the additional injuries. Id.

The defendants argue that "As for Warden Myers, after the incidents of March 4, 1999 occurred, he was notified that the plaintiff was involved in a disciplinary incident and placed in 4 point restraints." Defs' Mem., at 7. The facts and evidence tell (that this is knowingly dishonest) a different story. 6.5 Directive at 8.C. Exhibit 24. mandates: "Placement of an inmate in full stationary restraints on a restrictive status shall be authorized by the shift supervisor with the notification of the unit administrator (defendant Myers) within <u>one</u> (1) hour of placement". And: "The facility administrator (also defendant Myers) shall review the inmate's status every

#38

eight (8) hours". On March 4 and 5, 1999 when the plaintiff was being physically tortured in the "full stationary restraints" for more than 25 consecutive hours — defendant Myers was <u>well aware</u>. He admits that on both days he worked from 8:00 a.m. to 5:00 p.m., <u>See</u> his responses to the plaintiff's interrogatories dated June 23, 2004, Exhibit 28, at 4. **Further**, the March 4, 1999 Incident Reports — Page 1 and 2 have his name "Warden Myers" on Page-2 in upper left, and on this very document on March 5, 1999 he signed his signature. See Exhibit 20. <u>See video</u>, the first incident on tape, the plaintiff was soaked in urine, unclothed, on steel bed frame, tightly tied down by his hands and feet spread eagle, and they violently hurt him to forcefully place his arm back into the restraint -- then left him in this horrific condition for 25 long consecutive hours. Defendant Myers reviewed and signed his signature to these Incident Reports — Page 2. See Exhibit 21.
And following the restraint of the plaintiff, on March 9, 1999 the further retaliatory and excessive force <u>was</u> inflicted to the plaintiff, which very painfully ripped open all of his healing injuries, See video. Again, it is defendant Myers who was the supervisory official and who signed the

#39

relevant Incident Reports - Page 2, See Exhibit 22. Most importantly: it is <u>indisputable</u> that defendant Myers could have ended the four point restraint of the plaintiff at any time. See Gomez Depo., Exhibit 3, at 20-21. "[A] warden can end a restraint at any time."

Additionally, **defendant** Myers was placed on actual and constructive notice by Managing Attorney Jane Starkowski of Inmate Legal Assistance, She faxed him a three (3) page Declaration by the plaintiff which very specifically addressed the active retaliation. Fax was sent March 23, 1999 at 10:51 a.m., See Exhibit 9, at page 4 and 5 and the fax. Declaration in part states: "You are in receipt of the following Declarations: March 8, 9, 10, 15 and 16, 1999. The incidents that have taken place on March 4 and 9, 1999 <u>have been</u> addressed to you in the above stated Declarations. That it has been 16 days that medical staff and custody staff have intentionally refused me medical care, and a very high volume of my legal materials gone." Attorney Starkowski, followed up with a telephone call to Myers to verify that he, in fact, received the fax. See Exhibit 9, at page 4 and 5. Incredibly, defendant Myers' response

#40