UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DUANE ZIEMBA                           :
                                       :    PRISONER CASE NO.
        v.                             :    3:01-cv-2166 (JCH)(HBF)
                                       :
JOHN ARMSTRONG, ET AL.[1]              :    MARCH 28, 2005

## RULING RE:  DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT [DKT. NO. 92]

Plaintiff, Duane Ziemba, has filed this civil rights action pro se and in forma pauperis pursuant to 28 U.S.C. § 1915.  He alleges inter alia that the defendants used excessive force against him and failed to provide him with medical care on March 4, and 9, 1999.  Pending is the defendants' Motion for Summary Judgment.  For the reasons that follow, the Motion for Summary Judgment is granted in part and denied in part.

## I.    **Facts**[2]

In March 1999, defendant Larry Myers was the Warden at Northern Correctional Institution ("Northern"), defendant McAllister was a Correctional Medic at Northern, defendant DeGray was a Captain at Northern and defendant Armstrong was the Commissioner of Department of Correction.  On March 3, 1999, Ziemba slipped in the shower and injured his right ankle and a bone mass on his right foot.  Ziemba claims

---

[1]  The other defendants in this action are: Captain Kevin DeGray, Warden Larry Myers and Correctional Medic Reginal McAllister.

[2]  The facts are taken from the defendants' Local Rule 56(a)1 Statement  [Dkt. No. 92-3], the affidavits of Reginald McAllister, John Armstrong and Larry Myers and exhibits attached to the Defendants' Memorandum of Law In Support of Motion for Summary Judgment [Dkt. No. 92-1], Ziemba's Local Rule 56(a)2 Statement [Dkt. No. 105-3], and Ziemba's Affidavit and Exhibits  [Dkt. Nos. 105-2, 105-4].

that correctional officers contacted the medical unit and someone in the medical unit indicated that Ziemba would be seen the next morning.

Also on March 3, 1999, Ziemba made a legal telephone call from an interview room that was down the corridor from his cell. The officer who escorted Ziemba to the interview room noted that Ziemba was limping. Ziemba explained to the officer that he had calcium deposits in his right foot due to an injury he suffered when he was a child, but that he could walk on it.

On March 4, 1999, DeGray ordered a search of Ziemba's cell because he had observed materials on the floor in front of Ziemba's cell which appeared to be a device used by inmates to send contraband to one another. Two correctional officers prepared Ziemba to be transferred to a shower room where he would be held during the cell search. Ziemba submitted to the application of handcuffs, leg irons and a tether chain without incident, but then informed two correctional officers that he could not walk and wanted a wheelchair. When Ziemba refused the officers' order to walk to the shower, the officers removed the restraints and reported Ziemba's actions to DeGray.

DeGray then went to Ziemba's cell, directed him to approach the door for the application of handcuffs. Ziemba complied and then sat down. DeGray issued several orders to Ziemba to stand up and walk to the shower, but Ziemba refused to do so. DeGray called defendant McAllister to evaluate Ziemba's right foot. McAllister informed DeGray that Ziemba had previously complained of a broken foot and that x-rays had been taken in September 1998, revealing degenerative abnormalities, but no fracture of the foot. McAllister examined Ziemba and concluded that he did not suffer from a

2

broken foot and was capable of walking.

DeGray then issued another order to Ziemba to stand up and walk to the shower, but he refused to do so. Ziemba stated that he wanted to go to the shower and attempted to move himself along the floor, but DeGray stopped him. DeGray then authorized two correctional officers to use Department of Correction approved wrist/elbow escort position techniques to get Ziemba to stand up. The officers applied the techniques and Ziemba stood up. When the officers attempted to escort him out of the cell, Ziemba's legs went limp. The officers and DeGray then dragged Ziemba by the upper part of his arms down the short hallway and placed Ziemba in the shower room. Ziemba remained in the shower during the search of his cell.

After the search was completed, defendant DeGray removed Ziemba's leg irons and directed him to walk to his cell. Ziemba refused. DeGray authorized two correctional officers to use the same escort techniques to transport Ziemba to back to his cell. The officers applied the techniques and the officers and DeGray dragged Ziemba by the upper part of his arms to his cell, placed him on the bed and removed the leg restraints. After the officers removed the restraints from Ziemba's hands, Ziemba complained of injuries to his wrists. McAllister examined Ziemba's wrists, observed a small scratch on his left wrist and later applied a bandaid to it.

At approximately 12:00 p.m., Ziemba began repeatedly pressing the intercom button in his cell. Ziemba states that he pressed the button for two to three hours because he needed medical treatment for various injuries he sustained when officers dragged him down the hallway to the shower. Officer Polonis issued a disciplinary

report to Ziemba for pressing the intercom button on the ground that the action interfered with safety and security.  A disciplinary hearing officer subsequently found Ziemba guilty of the charge.  At approximately, 12:22 p.m., Ziemba showed DeGray a laceration on his left wrist and asked for medical treatment.  DeGray noted that this was a new injury that was not present when Ziemba was returned to his cell earlier that day. DeGray called the medical unit and asked McAllister to examine Ziemba's left wrist.  At approximately 12:30 p.m. McAllister examined Ziemba's left wrist, cleaned the laceration with iodine, and applied a bandaid.

DeGray reported that during a tour of Ziemba's housing unit with Major LaJoie at approximately 1:30 p.m., Ziemba stated that he might harm himself.  DeGray and Major LaJoie discussed Ziemba's situation and determined that he must be placed in soft four point restraints to protect him from harm.  Ziemba claims that DeGray placed him in four point restraints in retaliation for his filing grievances and lawsuits.  DeGray ordered officers to remove plaintiff's boxes of property from his cell during the application of the restraints.  During the application of the restraints, DeGray asked a nurse to examine Ziemba's back due to his complaints of back pain.

After the officers placed Ziemba in four point restraints, a nurse examined plaintiff's left wrist and noted a laceration.  The nurse cleaned the laceration and applied a bandage to it.  The nurse also examined Ziemba's head and checked the restraints to make sure that they were not too tight.  After the restraints were secure, DeGray asked a mental health worker to speak to Ziemba and assess his mental health needs.

At approximately 5:00 p.m., officers removed the restraint from Ziemba's right wrist to permit him to eat his dinner.  The following day, on March 5, 1999, at approximately 4:00 p.m., Lieutenant Oglesby, who is not a defendant in this case, issued an order to release Ziemba from the four point restraints.

On March 8, 1999, DeGray returned Ziemba's boxes of legal documents to him. Ziemba claims legal documents were missing from the boxes.

Ziemba's medical records reflect that on the morning of March 9, 1999, Ziemba refused to walk to the medical screening room to be examined because he claimed that he could not walk.  A medical staff member noted that correctional officers had observed Ziemba walking in his cell to get his breakfast tray and to turn his trash and that he had voiced no complaints of discomfort.  Another medical staff member noted that Ziemba had stood at his cell door during the 8:00 a.m. medication call and had not shown any signs of distress or voiced any complaints of pain or inability to walk.

On March 9, 1999, two officers were performing routine cell searches in Ziemba's unit.  Ziemba refused to be escorted to the shower during the cell search because he claimed that he could not walk.  The officers contacted the medical unit and medical staff indicated that Ziemba could walk.  DeGray went to Ziemba's cell.  Ziemba complied with DeGray's orders to be placed in restraints.  DeGray gave Ziemba several orders to stand up and walk to the shower.  Several officers attempted to help Ziemba get up from his bed, but Ziemba would not stand up and fell to the floor.  DeGray then authorized the correctional officers to use Department of Correction approved wrist/elbow escort position techniques to get Ziemba to stand up.  The officers applied

5

the techniques and Ziemba stood up.  When the officers attempted to escort him out of

the cell, Ziemba went limp and fell to the ground.  DeGray then ordered the officers to

pick Ziemba up off of the ground by all four limbs and carry him to the shower.  When it

was time for Ziemba to return to his cell, a nurse examined and treated a cut on his

right knee and lacerations on his right ankle.  Ziemba then stood up and hopped back

to his cell with the assistance of two correctional officers.  After the handcuffs were

removed, the nurse examined and treated open wounds on Ziemba's right and left

wrists.

## II.    **Standard of Review**

### I.    **Standard of Review**

In a motion for summary judgment, the burden is on the moving party to

establish that there are no genuine issues of material fact in dispute and that it is

entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d

293, 300 (2d Cir. 2000).  A court must grant summary judgment "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact . . . ."  Fed.

R. Civ. P. 56(c).  A dispute regarding a material fact is genuine "'if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party.'"  Aldrich v.

Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir.) (quoting Anderson, 477 U.S. at

248), cert. denied, 506 U.S. 965 (1992).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(c).  A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986), cert. denied, 480 U.S. 932 (1987).  A self-serving affidavit which reiterates the conclusory allegations of the complaint in affidavit form is also insufficient to preclude summary judgment.  See Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990).

The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide."  Aldrich, 963 F.2d at 523.  Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).  A party may not create a genuine issue of material fact by presenting contradictory or unsupported statements.  See Securities & Exchange Comm'n v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978).  Nor may he rest on the "mere allegations or denials" contained in his pleadings.  Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).  See also Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible).

7

Where, as in this case, one party is proceeding pro se, the court reads the pro se

party's papers liberally and interprets them to raise the strongest arguments suggested

therein.  See Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).  Despite this liberal

interpretation, however, a "bald assertion" unsupported by evidence, cannot overcome

a properly supported motion for summary judgment.  Carey v. Crescenzi, 923 F.2d 18,

21 (2d Cir. 1991).

III.    **Discussion**

The defendants raise four grounds in support of their motion for summary

judgment:  (1) Ziemba has failed to allege the personal involvement of defendants

Armstrong and Myers in the alleged use force by DeGray; (2) the claims against

McAllister fail to state a claim upon which relief may be granted; (3) the claims of denial

of access to courts fail to state a claim upon which relief may be granted; and (4) the

defendants are entitled to qualified immunity.

A.    **Personal Involvement**

The defendants argue that Ziemba has failed to allege the personal involvement

of Armstrong and Myers in the alleged use of excessive force by DeGray on March 4,

and 9, 1999.  Ziemba argues that the evidence demonstrates that Armstrong and Myers

were aware of retaliatory acts and unsafe conditions of confinement at Northern, but

failed to take any action to remove Ziemba from Northern, and as a result, he was

exposed to excessive force by DeGray.

In order to state a claim for damages under section 1983, Ziemba must

demonstrate a defendant's direct or personal involvement in the actions which are

alleged to have caused the constitutional deprivation.  See Gill v. Mooney, 824 F.2d

192, 196 (2d. Cir. 1987); McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977), cert.

denied, 434 U.S. 1087 (1978).  "A supervisor may not be held liable under section 1983

merely because his subordinate committed a constitutional tort."  Leonard v. Poe, 282

F.3d 123, 140 (2d Cir. 2002).  Section 1983 imposes liability only on the official causing

the violation.  Thus, the doctrine of respondeat superior is inapplicable in section 1983

cases.  See Blyden v. Mancusi, 186 F.3d 252, 264 (2d Cir. 1999).

A supervisory official who has not directly participated in the conduct complained

of may be found personally involved in the deprivation of an inmate's rights in other

ways.

> The personal involvement of a supervisory defendant may
> be shown by evidence that:  (1) the defendant participated
> directly in the alleged constitutional violation, (2) the
> defendant, after being informed of the violation through a
> report or appeal, failed to remedy the wrong, (3) the
> defendant created a policy or custom under which
> unconstitutional practices occurred, or allowed the
> continuance of such a policy or custom, (4) the defendant
> was grossly negligent in supervising subordinates who
> committed the wrongful acts, or (5) the defendant exhibited
> deliberate indifference to the rights of inmates by failing to
> act on information indicating that unconstitutional acts were
> occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)(citing Wright v. Smith, 21 F.3d 496,

501 (2d Cir.1994)).

### 1.    Commissioner Armstrong

It is apparent that Ziemba has named Commissioner Armstrong as a defendant

because of his supervisory role in the Department of Correction.  Ziemba claims that he

made Armstrong aware of the hostile environment at Northern Correctional Institution through letters and grievances, before the alleged use of force by DeGray, but that Armstrong failed to take any action based on the information provided to him.

Ziemba has submitted copies of a number of documents in support of his claim that Armstrong was aware of the hostile environment at Northern before the incidents in March 1999.  Ziemba claims that Armstrong was aware of the alleged use of excessive force by Captain Mangiafico against Ziemba in August 1998 and that Armstrong was involved in the investigation of the allegations against Captain Mangiafico.  As a result of the Department of Correction's investigation, Armstrong suspended Captain Mangiafico for five days and transferred him from Northern Correctional Institution.

Ziemba has also submitted a copy of September 1998 letter from his mother addressed to Armstrong in which she requests that he be transferred out of Northern due to the August 1998 incident and another unidentified incident in October 1997.  Ziemba has submitted two letters to Armstrong dated in September 1998, regarding an incident that occurred at Corrigan Correctional Institution.  Armstrong responded to all of the letters and informed Ziemba and his mother that the Department of Correction was investigating the incident at Corrigan and that Ziemba's complaints about staff misconduct at Northern were being investigated by the Department's Security Division.

On October 16, 1998, Ziemba informed Armstrong that prison officials at Northern had tampered with his food on September 27, 1998.  Armstrong referred the matter to the Security Division for investigation.  An investigation was conducted by the Security Division and Dr. Blanchette reviewed Ziemba's medical records and tests.  Dr.

Blanchette concluded that there was no evidence to support Ziemba's claim that Department of Correction officials had tampered with his food.

In February 1999, Ziemba filed three grievances with the grievance coordinator at Northern in which he complained of harassment by DeGray. These grievances include notations that copies were sent to Armstrong and Myers. Ziemba has provided no evidence that Armstrong received the copies of the grievances. Myers investigated the allegations in the grievances and found them to be unsubstantiated.

It is evident from the documents submitted by Ziemba and the defendants that Armstrong took action with respect to Ziemba's claims of excessive use of force in August 1998 and his claims of food tampering in September 1998. Those allegations were investigated by the Security Division of the Department of Correction and action was taken based on the conclusions of the investigators. Captain Mangiafico was transferred out of Northern. Thus, he was no longer a threat to Ziemba. Ziemba's allegations of food tampering were investigated and found to be without merit. Armstrong also responded to the many letters addressed to him by Ziemba and referred any allegations of misconduct to the Security Division for investigation. With respect to the grievances filed with the grievance coordinator in February 1999, copies of which were allegedly sent to Armstrong, courts within the Second Circuit have held that mere receipt of a letter from an inmate is insufficient to impute personal involvement on the correctional official to whom the letter was addressed. See Burgess v. Morse, 259 F. Supp. 2d 240, 248 (W.D.N.Y. 2003) ("[T]he fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal

involvement.") (citation omitted); <u>Johnson v. Wright</u>, 234 F.Supp. 2d 352, 363 (S.D.N.Y. 2002).  Here, Armstrong investigated Ziemba's claims against DeGray and found them to be unsubstantiated.

The court concludes that Ziemba has failed to present evidence to create an issue of fact that Armstrong was aware of alleged unconstitutional conduct against Ziemba and failed to take any action to investigate it.  Thus, Ziemba has failed to meet his burden of demonstrating that Armstrong was personally involved in any of the incidents giving rise to the amended complaint.  The motion for summary judgment is, therefore, granted as to all claims against defendant Armstrong.[3]

## 2.  <u>Warden Myers</u>

Myers argues that he was not aware of or involved in any ongoing threats of harm to Ziemba or hostile environment at Northern because he did not become the Warden at Northern until February 1999.  Ziemba has submitted no evidence to controvert statements in the Myers affidavit concerning the month and year he became the Warden at Northern.

---

[3]  Ziemba also argues that through the issuance of State of Connecticut Department of Correction Administrative Directive 6.5, defendant Armstrong created an unconstitutional policy or custom regarding the placement of inmates in four point restraints and that this policy lead to the injuries he suffered while in restraints on March 4, and 5, 1999.  Ziemba contends that the issuance of this unconstitutional policy demonstrates Armstrong's involvement in the excessive force that was used against him.   This claim concerning the issuance of unconstitutional provisions of Administrative Directive 6.5 is not set forth in Ziemba's complaint or amended complaint.   A complaint cannot be amended by a memorandum in opposition to a motion for summary judgment.  <u>See</u> <u>Natale v. Town of Darien</u>, No. CIV. 3:97CV583 (AHN), 1998 WL 91073, at *4 n. 2 (D. Conn. Feb. 26, 1998) (holding plaintiff may not amend complaint in memorandum of law) (citing <u>Daury v. Smith</u>, 842 F.2d 9, 15-16 (1st Cir. 1988)); <u>Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.</u>, 723 F. Supp. 976, 987 n.5 (S.D.N.Y. 1989) (same).  Thus, there is no claim regarding the issuance of unconstitutional provisions of Administrative Directive 6.5 before the court, and that claim is not considered in this ruling.

Ziemba has submitted copies of three grievances that he filed with the grievance coordinator at Northern and a letter that he sent to Myers in February 1999. In the letter, he informed defendant Myers that DeGray had been harassing him, and he asked to moved to a different housing unit away from DeGray. Myers investigated Ziemba's allegations, found them to be unsubstantiated, and denied Ziemba's grievances. Thus, Ziemba has submitted evidence that Myers was aware of allegations by Ziemba concerning misconduct by DeGray prior to the alleged use of force in March 1999.

Ziemba has also submitted evidence that he made Myers aware of the alleged unconstitutional conduct by DeGray after the conduct occurred. Ziemba has filed copies of a letter from Inmates' Legal Assistance Program and a declaration addressed to Myers dated March 18, 1999. The attorney from the Inmates' Legal Assistance Program faxed the declaration to Myers on March 23, 1999. The declaration includes allegations that Ziemba had not received medical treatment for the injury to his right foot and that his legal materials had been confiscated on March 4 and 9, 1999. The declaration references other declarations sent to Myers from Ziemba earlier in March 1999, but Ziemba has not submitted those declarations in opposition to the motion for summary judgment. Ziemba has also submitted copies of disciplinary reports, appeals of those reports, and incident reports which include Ziemba's claim that DeGray used excessive force against him on March 4 and 9, 1999. Thus, Ziemba has submitted sufficient evidence to support his claim that Myers knew of the harassment by DeGray before the alleged use of excessive force and that after the alleged used force Myers

13

failed to take any action to remedy the situation.  Thus, the motion for summary

judgment is denied as to Myers on the ground that he was not personally involved in the

alleged use of force by DeGray on March 4, and 9, 1999.

## B.    Failure to State a Claim

The defendants contends that McAllister was not deliberately indifferent to

Ziemba's medical needs.  Ziemba argues that the videotape of the March 4, 1999

incident involving his escort to the shower shows McAllister's deliberate indifference to

his serious medical need.

The Eighth Amendment protects inmates from deliberate indifference by prison

officials to their serious medical needs.  See Estelle v. Gamble, 429 U.S. 97, 104

(1976).  To prevail on such a claim, Ziemba must allege "acts or omissions sufficiently

harmful to evidence deliberate indifference to serious medical needs."  Id. at 106.  A

prisoner must show either intent to deny or unreasonably delay access to needed

medical care or the wanton infliction of unnecessary pain by prison personnel.  See id.

at 104-05.  Mere negligence will not support a section 1983 claim; the conduct

complained of must "shock[ ] the conscience" or involve[ ] unnecessary and wanton

infliction of pain"  Hathaway v. Coughlin, 99 F.3d 550 (2d Cir. 1996).  A treating

physician will be liable under the Eighth Amendment only if his conduct is "repugnant to

the conscience of mankind."  Estelle, 429 U.S. at 105-06.

The civil rights statute was not meant to redress medical malpractice claims that

can be adequately resolved under state tort law.  Tomarkin v. Ward, 534 F. Supp. 1224,

1231 (S.D.N.Y. 1982).  Thus, a claim of misdiagnosis, faulty judgment, or malpractice

14

without more to indicate deliberate indifference, is not cognizable under section 1983.

See McCabe v. Nassau County Medical Center, 453 F.2d 698, 704 (2d Cir. 1971).  In

addition, mere disagreement with prison officials about what constitutes appropriate

medical care does not state a claim cognizable under the Eighth Amendment.  See

Hyde v. McGinnis, 429 F.2d 864, 867-68 (2d Cir. 1970) (citing cases).

There are both subjective and objective components to the deliberate

indifference standard.  See Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994), cert.

denied sub nom. Foote v. Hathaway, 513 U.S. 1154 (1995).  The alleged deprivation

must be "sufficiently serious" in objective terms.  Wilson v. Seiter, 501 U.S. 294, 298

(1991); see also Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting)

("'serious medical need' requirement contemplates a condition of urgency, one that may

produce death, degeneration, or extreme pain").  The Second Circuit has identified

several factors that are highly relevant to the inquiry into the seriousness of a medical

condition: "'[t]he existence of an injury that a reasonable doctor or patient would find

important and worthy of comment or treatment; the presence of a medical condition that

significantly affects an individual's daily activities; or the existence of chronic and

substantial pain.'"  Chance v. Armstrong, 143 F.3d 698, 702 (2d. Cir. 1998) (citation

omitted).  In addition, where the denial of treatment causes a plaintiff to suffer a

permanent loss or life-long handicap, the medical need is considered serious.  See

Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000).

In addition to demonstrating a serious medical need to satisfy the objective

component of the deliberate indifference standard, an inmate also must present

15

evidence that, subjectively, the charged prison official acted with "a sufficiently culpable state of mind." Hathaway, 37 F.3d at 66. "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Id. (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

Ziemba contends that McAllister never examined his right ankle and foot before DeGray and two other officers dragged him by his upper arms to the shower. McAllister has submitted an affidavit in which he states that he examined Ziemba's foot and ankle before Ziemba was escorted to the shower on March 4, 1999, and concluded that Ziemba did not suffer from a broken foot and could walk. In addition, the videotape submitted by the defendants demonstrates that Ziemba acknowledged that McAllister had examined him before he was taken to the shower.

After Ziemba was brought back to his cell from the shower, Ziemba only complained of injuries to his wrists. The videotape and the medical incident report completed by McAllister show that McAllister examined Ziemba's wrists through the slot in the cell door and that he observed a small abrasion to Ziemba's left wrist. McAllister provided Ziemba with a bandage for the abrasion. At the request of DeGray, McAllister again examined Ziemba's wrists approximately two hours later. McAllister observed a laceration on the left wrist and applied iodine and a bandage to the wound.

16

There are no other allegations that McAllister provided or failed to provide Ziemba with medical care.  McAllister was not the nurse on duty during the application of four point restraints on Ziemba later on March 4, 1999, the removal of the restraints the next day, or the escort of Ziemba to and from the shower on March 9, 1999.  In light of these facts, Ziemba has failed to meet his burden of demonstrating that there are genuine issues of material fact as to whether McAllister was deliberately indifferent to Ziemba's medical needs on March 4, 1999.  Defendants' Motion for Summary Judgment is granted as to the claims against McAllister.

DeGray argues he was not deliberately indifferent to Ziemba's medical needs. The videotape and medical incident reports issued by various medical personnel who treated Ziemba on March 4, and 9, 1999, demonstrate that DeGray requested medical treatment in response to Ziemba's complaints of injuries.  After the four point restraints were applied to Ziemba on March 4, 1999, at the request of DeGray, a nurse examined Ziemba's wrists, head and back and cleaned and bandaged the laceration on Ziemba's left wrist.  When the restraints were removed from Ziemba on March 5, 1999, a nurse examined Ziemba, cleaned the laceration on Ziemba's left wrist, and applied a bandage to it.  The medical records reflect that Ziemba received medication at 8:00 a.m. on March 19, 1999.  At that time, a nurse observed that Ziemba was able to stand at his cell door, was not in any distress, and voiced no complaints of pain, discomfort or inability to walk.  Ziemba was scheduled to be seen by medical personnel later that morning, but he refused to walk to the medical screening room for treatment.  In the afternoon of March 9, 1999, after Ziemba was carried to the shower, a nurse treated the

17

cuts to his right knee and ankle.  After Ziemba hopped back to his cell, the same nurse treated the lacerations to Ziemba's wrists.  Ziemba does not allege that he made any other specific requests for medical treatment to DeGray during this period of time.

Based on these facts, the court concludes that Ziemba has not met his burden of creating a material issue of fact concerning DeGray's deliberate indifference to his medical needs on March 4, 1999 or March 9, 1999.  The motion for summary judgment is granted as to the claims of denial of medical treatment as to DeGray.

### C.    Claims of Denial of Access to Courts

The defendants argue that Ziemba has not demonstrated that he suffered an injury due DeGray's confiscation of Ziemba's legal materials on March 4, 1999, and failure to return all of the materials on March 8, 1999.  Ziemba contends that DeGray's actions caused him permanent damage.

It is well established that inmates have a constitutionally protected right of access to the courts.  Bounds v. Smith, 430 U.S. 817, 821-25 (1977).  In Lewis v. Casey, 518 U.S. 343 (1996), the Supreme Court clarified what is encompassed in an inmate's right of access to the courts and what constitutes standing to bring a claim for the violation of that right.  First, the Lewis Court held that to show a violation of his right of access to the courts, an inmate must allege an actual injury.  Id. at 349.  The inmate must show that "the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim."  Id. at 351.  In addition, the Court observed that "the injury requirement is not satisfied by just any type of frustrated legal claim."  Id. at 354.

18

Ziemba alleges that the legal materials that were confiscated by DeGray cannot be replaced and that he has been permanently damaged.  Ziemba states in his affidavit that DeGray confiscated evidence pertaining to his state criminal conviction, legal research, and evidence and records pertaining to his lawsuit against Captain Mangiafico.  He claims that confiscation of the material related to his conviction hindered his ability to challenge the legality of the conviction.  He alleges that his family retained copies of the documents and other evidence relating to his lawsuit against Mangiafico.

On November 18, 1998, a state court judge sentenced Ziemba to thirteen years of imprisonment.  See Ziemba v. Armstrong, No. CV 010447749S, 2003 WL 21384279, at *1 (Conn. Super. Ct. June 2, 2003).  Ziemba appealed his conviction and was represented on appeal by an attorney from New Haven Legal Assistance, Inc.  See id., at *3.  In addition, Ziemba filed a state habeas petition challenging his conviction and sentence in 2001.  See id., at *1.  Ziemba was represented by counsel in the state habeas petition as well.  See id.  Thus, Ziemba's has not demonstrated that the confiscation of unidentified legal materials relating to his conviction interfered with ability to challenge the conviction and sentence.

Ziemba claims that DeGray also confiscated documents relating to his lawsuit against Captain Mangiafico and the cost of copying the copies of those documents retained by his family was substantial.  Ziemba has not alleged that his case against Captain Mangiafico was dismissed or that any deadlines were missed due to the confiscation of materials relating to the case.  In fact, the court denied in part several

19

motions for summary judgment filed by the defendants in that action and the case remains pending against Captain Mangiafico and several other defendants.

Ziemba has failed to meet his burden of demonstrating that he suffered an injury as a result of the confiscation of his legal documents by DeGray in March 1999. Accordingly, the motion for summary judgment is granted as to the claim of denial of access to the courts.

### D.    Qualified Immunity

DeGray argues that Ziemba has failed to allege and create a factual record that could support a jury finding DeGray used excessive force in violation of the Eighth Amendment when he escorted Ziemba to the shower on March 4 and 9, 1999. DeGray further argues that, even if the court concludes that he did violate Ziemba's Eighth Amendment rights, he is entitled to qualified immunity.

The doctrine of qualified immunity "shields government officials from liability for damages on account of their performance of discretionary official functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Rodriguez v. Phillips, 66 F.3d 470, 475 (2d Cir. 1995) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  To determine whether qualified immunity is warranted, the court first must address the question:  "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Saucier v. Katz, 533 U.S. 194, 201 (2001).

> [I]f a violation could be made out on a favorable view of the

20

> parties' submissions, the next, sequential step is to ask
> whether the right was clearly established.  This inquiry, it is
> vital to note, must be undertaken in light of the specific
> context of the case, not as a broad general proposition . . .
> The relevant dispositive inquiry in determining whether a
> right is clearly established is whether it would be clear to a
> reasonable [state official] that his conduct was unlawful in
> the situation he confronted.

Id.  (citing Wilson v. Layne, 526 U.S. 603, 615 (1999)).

The law regarding use of excessive force by correctional officers against prison

inmates was clearly established in March 1999.  In Hudson v. McMillian, 503 U.S. 1

(1992), the Supreme Court established the minimum standard to be applied in

determining whether force by a correctional officer against a sentenced inmate states a

constitutional claim under the Eighth Amendment in contexts other than prison

disturbances.  When an inmate claims that excessive force has been used against him

by a prison official, he has the burden of establishing both an objective and subjective

component to his claim.  Id. at 8; see also Romano v. Howarth, 998 F.2d 101, 105 (2d

Cir. 1993).  The objective component relates to the seriousness of the injury, however,

the use of excessive force against a prisoner may constitute cruel and unusual

punishment even when the inmate does not suffer serious or significant injury, provided

that the amount of force used is more than de minimus, or involves force that is

repugnant to the conscience of mankind.  Hudson v. McMillian, 503 U.S. at 8-9.  This

component is "contextual and responsive to 'contemporary standards of decency.'"

Hudson, 503 U.S. at 2 (quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976)).  The

subjective component requires the inmate to show that the prison officials acted

wantonly.  This inquiry turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Id.  The court considers factors including "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response."  Id. (internal quotations and citation omitted).

First, the court must determine if, taking the facts in the light most favorable to Ziemba, the facts set forth a claim for use of excessive force. The record contains two different descriptions of the events, one in Ziemba's affidavit and one in the videotape and incident reports of DeGray and the two other correctional officers involved in escorting Ziemba to the shower.  Based on Ziemba's affidavit, the incident reports of DeGray and the two correctional officers who initially went to Ziemba's cell to escort him to the shower on March 4, 1999, and the objective evidence in the form of the videotape of the incidents, the undisputed facts are that on March 3, 1999, Ziemba walked to an interview room which was farther down the corridor from his cell than the shower, on March 4, 1999; Ziemba could walk and move around his cell holding onto objects in the cell for support; McAllister did examine Ziemba and concluded that Ziemba did not have a broken foot and could walk and Ziemba did not comply with DeGray's orders to stand up and walk to the shower.

Ziemba need not prove that he suffered a "significant injury" to state a claim of excessive force.  See Hudson, 503 U.S. at 9 ("[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are

22

violated" irrespective of whether significant injury is present); Sims v. Artuz, 230 F.3d 14, 21 (2d Cir. 2000) ("no such showing of extreme injury is required when the claim is that prison officials used excessive force"); Blyden v. Mancusi, 186 F.3d 252, 263 (2d Cir. 1999) ("certain actions, including the malicious use of force to cause harm, constitute Eighth Amendment violations per se" whether or not significant injury is evident). The videotapes shows that Ziemba had a small abrasion on his left wrist after he was escorted to the shower and back to his cell on March 4, 1999. Ziemba avers that he later experienced a laceration to his left leg, a cut above his right ankle, cuts to his right hand and wrist and left hand and wrist, bruising, a back injury and sore testicles. The videotape shows that later on March 4, 1999, Ziemba complained of a laceration on his left wrist and back pain. On March 9, 1999, the videotape reveals that Ziemba had cuts on his right knee, right ankle and lacerations to his left and right wrists after he was escorted to and from the shower. The court concludes that Ziemba has presented evidence to demonstrate that the injuries he suffered as a result of his escorts to and from the shower on two occasions in March 1999 were serious enough to state a claim under the objective prong of the Eighth Amendment excessive force standard.

DeGray argues that the force used to escort Ziemba to the shower was not wanton or malicious. He contends that force was necessary because Ziemba needed to be out of his cell to enable the officers to conduct the cell search and Ziemba had violated several direct orders to exit the cell and walk to the shower. In addition, the videotape shows that minimal force was used to escort Ziemba to the shower.

As to the March 4, 1999, incident, the videotape shows that Ziemba refused DeGray's orders to stand up and walk to the shower, DeGray authorized two officers to use wrist/elbow escort position techniques to get Ziemba to stand, Ziemba went limp and the officers and DeGray held Ziemba by his upper arms and dragged him down a short hallway to the shower and then placed him in the shower room.  After the search of Ziemba's cell, Ziemba refused to walk or stand and the officers and DeGray escorted Ziemba back to his cell in the same manner.  It is evident from the videotape that any kicks to Ziemba's legs were inadvertent and were due to the difficulty in maneuvering Ziemba down the narrow hallway to his cell.

In the morning of March 9, 1999, Ziemba refused to go to the medical screening room to be examined.  He claimed that he could not walk to get there.  Later that day, two officers were conducting routine searches of inmates' cells in Ziemba's housing unit.  Ziemba refused the officers' orders to exit his cell during the search and to walk to the shower room.  Based on the observations of other officers that plaintiff was walking and moving around his cell to retrieve his breakfast tray and turn in his trash, DeGray determined that Ziemba could walk to the shower.  After Ziemba submitted to the application of handcuffs, leg irons and a tether chain, the videotape reveals that the officer attempted to assist Ziemba to stand up, but he did not stand up and sat down on the ground.  DeGray then authorized escort techniques to get Ziemba to his feet. Ziemba stood up, but when the officers attempted to move him out of the cell he went completely limp and fell to the floor.  The officers and DeGray then carried Ziemba by all four limbs to the shower room.  On the way back from the shower, Ziemba stood up and hopped back to his cell with assistance.  Thus, it is apparent that Ziemba could

24

have stood up and hopped to the shower earlier.

Based on the undisputed facts relating to both incidents and the objective evidence in the form of the videotape of both incidents, the court concludes that DeGray has demonstrated that he is entitled to qualified immunity on the undisputed facts or disputed facts taken in the light most favorable to Ziemba. Ziemba has failed to come forward with evidence that could support a jury finding that the force used by DeGray to escort Ziemba to the shower on two occasions in March 1999, was employed maliciously and sadistically to cause harm rather than in an effort to restore or maintain discipline.

Thus, the motion for summary judgment is granted as to the claims that DeGray used excessive force against Ziemba when he and other officers escorted Ziemba to the shower room on March 4, and 9, 1999. Because the court has concluded that DeGray is entitled to summary judgment on these excessive force claims, defendant Myers, as DeGray's supervisor, is also entitled to summary judgment on these same claims.

### E.   Remaining Claim

Ziemba's amended complaint includes a claim concerning his placement in four point restraints on March 4, 1999, and his continued confinement in those restraints until March 5, 1999, some twenty-five hours later. He claims that DeGray ordered that he be placed in those restraints for punitive purposes and that he remained in the restraints for an unreasonable period of time and without proper medical care. In his affidavit, Ziemba states that he was not permitted to use the toilet during the twenty-five hour period, was forced to urinate on himself, was fed only once during that period,

denied any liquids, was denied clothing, was denied a mattress and medical care.

In their motion for summary judgment, the defendants refer to the claim relating to Ziemba's confinement in four point restraints in passing and simply state that the videotape demonstrates there is no evidence to support Ziemba's claim that he was placed in restraints for punitive purposes.  The videotape, however, does not cover the time period prior to Ziemba's placement in restraints when Ziemba allegedly told Major LaJoie and DeGray that he wanted to harm himself and DeGray has not submitted an affidavit regarding Ziemba's statement.  In addition, the defendants have not addressed Ziemba's claim that his placement in restraints was in retaliation for his filing lawsuits and grievances or the claim that twenty-five hours in restraints is unreasonable.  Thus, the court concludes that the defendants have not sufficiently addressed Ziemba's claims concerning the reasons for his placement in four point restraints, the decision to keep him in restraints for twenty-five hours and the allegedly unconstitutional conditions during his confinement in restraints.  Accordingly, the motion for summary judgment is denied as to Ziemba's claim that DeGray placed him restraints for punitive reasons and in retaliation for his filing lawsuits and grievances and left him restraints for an unreasonably long period of time.

IV.    **CONCLUSION**

The Motion for Summary Judgment [**Dkt. No. 92**] is **GRANTED** as to all claims, except Ziemba's claim that DeGray placed him in restraints for punitive reasons and in retaliation for his filing lawsuits and grievances and left him in restraints for an unreasonably long period of time.  Ziemba's Motion for Permission to File Amended

Interrogatories on Defendant Armstrong [**Dkt. No. 107**] is **DENIED** as moot.

**SO ORDERED.**

Dated this 28th day of March, 2005, at Bridgeport, Connecticut.


/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge